CHARLIE KEITH v. THE STATE.

·No. 7061.   Decided February 7, 1923.

Rehearing denied March 7, 1923.

### 1.—Murder—Manslaughter—Requested Charges—Self-defense.

Where both of the refused charges based defendant's defense on the theory that if deceased shot or was shooting at defendant before the latter fired, he should be acquitted, and the main charge substantiated to the same effect, there was no error in refusing them.

### 2.—Evidence—Husband and Wife—Res Gestae.

Where, upon trial of murder and a conviction of manslaughter, defendant complained because of a statement of defendant's wife put in evidence through the wife of deceased that she (appellant's wife) told her that her side was hurting her so bad she could hardly walk, where defendant hit her, as it was testimony of defendant's wife against him. Held, that it was either res gestae or admissible in the presence and hearing of defendant; viewing the matter in the light of all the facts and the verdict rendered.

### 3.—Rehearing—Declaration of Defendant's Wife.

Where there is absolutely nothing in the statement attributed to defendant's wife which sheds any light upon the question of self-defense, and nothing which could have led the jury to wrongfully convict defendant of any degree of unlawful homicide, the same is not reversible error, and the motion for rehearing is overruled.

Appeal from the District Court of Titus. Tried below before the Honorable R. T. Wilkinson.

Appeal fro ma conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. A. Ward,* for ·appellant.—On question of declaration of wife of deceased: Hurst v. State, 217 S. W. Rep., 156; City of Austin v. Ritz, 72 Texas, 391.

On question of husband and wife, Kay v. State, 64 S. W. Rep., 1057.

R. G. *Storey,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Appellant was indicted for murder, charged with the killing of Stewart Keith, his son. Conviction for manslaughter resulted, the punishment assessed being two years confinement in the penitentiary.

The facts immediately attending the killing are detailed by two witnesses only, the wife of deceased and appellant himself. Appellant and deceased lived upon farms about a mile from each other. On the day of the killing appellant and his wife, together with deceased and his wife had gone to the town of Cookville in appellant's car. There is some evidence in the record indicating that during the day both appellant and deceased were drinking to some extent, but the relations between them appeared to be entirely friendly. They returned to the home of appellant about dark, deceased and his wife walking from there across the field to their house. They expected to attend a party that night, and after having eaten supper and about the time they were ready to leave appellant was seen coming through the field. Deceased stepped out in the yard as appellant came up and the latter asked deceased, (speaking of appellant's wife and the mother of deceased)" if Ma was there," to which the deceased replied that she was not. Mrs. Stewart Keith, (deceased's wife) testified that this question was asked in an angry manner, whereupon the deceased asked him what was the matter, to which appellant replied, "Nothing, they had just had a cuss fight." Appellant had his shotgun and pistol with him. Deceased asked appellant to give him his guns, which appellant declined to do. About this time appellant's wife was seen coming towards the house, she having apparently come around the road from their home as appellant came through the field. Deceased's wife called his attention to the fact that his mother was approaching but whether appellant knew of her approach is not disclosed from the record. Appellant's and Mrs. Stewart Keith's testimony do not vary materially as to what occurred up to this point, but here diverge sharply. Deceased's wife says when her husband asked his father to give up his guns deceased started toward appellant but had no weapon in his hand and was making no demonstration whatever as though to harm him; that appellant told him if he came any nearer he would shoot him; that as deceased continued to approach him, still requesting him to surrender his guns, and telling him in this connection that "he could not come down there and treat him and his mother that way," appellant drew his pistol and fired; that when the pistol fired she turned and ran into the house; that other shots followed in rapid succession but she did not see them fired. Almost immediately she returned to the yard and found both appellant and deceased upon the ground. Appellant

was shot through both legs and one finger had been shot away. Deceased was only struck one time. Appellant's version of the affair is that when his son demanded the surrender of his (appellant's) guns, deceased had a pistol in his hand at the time; that appellant declined to surrender the guns but admits he told deceased to stand back or he would shoot him. He claims that at this point deceased fired at him, striking one of his fingers, and also shooting him again in both legs; that he then fired at deceased in self-defense. When deceased's wife got to the parties after the shooting was over deceased had both his own and his father's pistol in his hand and gave them to his wife. Appellant says after the shooting when they were both on the ground he pitched his own pistol over to deceased, and thus accounts for both pistols being in the possession of his son. It is in evidence that deceased had talked to one of his uncles some three weeks or a month before the killing advising with him about leaving the place where he was then living, expressing fear that he and his father were going to have trouble, but did not tell this uncle what the trouble was about. Another uncle testified that about the same time deceased also had a conversation with him in which he cursed his father and said "he would kill him if he ever crossed his path again or had any more trouble with his mother." Another relative of appellant testified that some four or five months before the killing he heard some wordy trouble between deceased and appellant that came up about deceased's mother; that appellant and his wife were separated at the time and appellant claimed that someone else was the cause of her not coming home; that deceased denied this, called his father a liar, and used some other violent language; that upon appellant protesting at the language of deceased the latter replied, "Pa, you have run over Ma as long as I will stand for it." Deceased had his knife out but the witness interfered and no further trouble occurred. No further statement of the facts is necessary unless it be in connection with the discussion of some of the bills of exception.

Two special charges presenting the issue of self-defense was requested and refused. One embraced the proposition that appellant had the right to carry his shot-gun, and if he was not making threats to injure any one with it, deceased had no right to take it from him. No limitation whatever having been placed on appellant's right of self-defense, there was no necessity for giving the requested charge. Section 1950, page 1091, Branch's Ann. P. C. Both of the refused charges base appellant's defense on the theory that if deceased shot at or was shooting at appellant before the latter fired he should be acquitted. The main charge is substantially to the same effect, and we think sufficiently covered the subject.

The only serious contention upon which a reversal is sought is because of a statement of appellant's wife put in evidence through the wife of deceased, that "She (appellant's wife) told me that her side

was hurting her so bad she could hardly walk, where Mr. Keith (appellant) hit her." This was objected to at the time it was offered on the ground that it was not admissible unless the State first could show it was heard by appellant. Motion to withdraw it from the jury was based upon the ground that it was causing the wife to testify against the husband. Between the time deceased and his wife left the father and mother at their home until the father appeared at his son's house inquiring for his (appellant's) wife this record makes it plain that trouble of some kind had occurred between them. This is clear, independent of the statement objected to. It is also apparent that the presence of appellant and his wife at the son's about the same time was because of this trouble. Deceased and his wife had been invited to spend the night at their father's only a short time before. Everything was peaceable then. Immediately upon reaching his son's appellant, in an angry voice, inquired for his wife, and upon being asked by deceased what was the matter stated "we had a cuss fight." At the time of the shooting appellant's wife was approaching and was near the scene. She turned, however, and went the road back to her home to telephone for a doctor. She then returned through the field. The distance traversed by her was about one and one half miles. When she reached the scene of the shooting the second time deceased called her and his wife to him. He and appellant were both lying on the ground about ten feet apart, and both wounded. After testifying that deceased called her and his mother to him, Mrs. Alice Keith (deceased's wife) continued her testimony as follows:

"I don't know what language he (appellant) was using. I don't remember anything he said until Mrs. Keith came up then he cursed her; but I could not tell what he said for I don't know. I can't tell what he said. He cursed her and told her she was the cause of it. She had a bruised place about her eye and on her side. Mr. Keith was right there and she told me that *her side was hurting her so bad she could hardly walk, where Mr. Keith hit her*. Mr. Keith was cursing her but I don't remember the language he used. Mr. Keith was right there when she told me what I have just stated. I don't know whether he heard what she said or not, but he was right there; so far as I know he may not have heard what she said to me. We were nearer Stewart (deceased) than Charlie Keith (appellant) ; we were bathing Stewart when she told me that. I suppose she spoke in a subdued tone of voice. I don't know how long it was after the shooting."

The quotation from the statement of facts shows the connection in which the statement complained of was made. We deem it unprofitable to enter into a discussion of whether it was admissible as res gestae; or whether it was admissible if made in the presence and hearing of appellant in connection with his cursing and charging his wife with being the cause of the killing. Viewing the matter in the light of all the facts and the verdict rendered, we are of opinion if the re-

ception in evidence of the statement was of doubtful propriety, or even erroneous, it would not call for a reversal. The issue of self-defense was not limited in any way by what may have transpired shortly theretofore between appellant and his wife. The jury decided that issue for the State. The punishment assessed was the lowest permitted upon a manslaughter conviction, leading to the conclusion that the evidence complained of was not appropriated by the jury to the injury of accused even if improperly admitted.

Believing the record calls for an affirmance of the judgment, it is so ordered.

*Affirmed.*

ON REHEARING

March 7, 1923.

LATTIMORE, JUDGE.—Appellant insists that we erred in declining to reverse his case because of the admission in testimony of a statement made by his wife at the scene of the homicide and shortly thereafter; the testimony coming from the lips of appellant's daughter-in-law, the wife of deceased. We have again considered the matter. It appears without dispute that appellant shot and killed his son on the occasion in question. He testified that he shot in self-defense after having been shot by deceased. The wife of deceased testified that appellant came up to the place where the homicide occurred, angry and inquiring for his wife with whom he said he had just had some kind of a fight. That when deceased remonstrated with appellant and told him that he ought not to have any trouble with his mother and tried to get appellant to surrender to him the gun and pistol which the latter was carrying, appellant declined, and when deceased further insisted, that appellant shot inflicting upon deceased the mortal wound. Under no phase of the State's testimony could the homicide be reduced to a less offense than manslaughter. The statement of the wife testified to by the daughter-in-law, appears in our original opinion. There is absolutely nothing in it which sheds any light upon the question of self-defense, and nothing which could have led the jury to wrongfully convict appellant of any degree of unlawful homicide. We cannot attach the importance to it which appellant ascribes in his motion. It was already in evidence that appellant said he and his wife had just had a fight. The statement of the wife made in the presence of appellant and without denial on his part, was that he had just hit her and her side was hurting her very badly. If the jury had found appellant guilty of a graver offense than manslaughter, or if they had given to him more than the minimum penalty therefor, this court might be in some doubt of the fact that passion or prejudice of the jury was aroused, and in that event would have been more inclined to consider seriously the contention of appellant. We do not believe the evidence

is shown to be inadmissible, nor do we conclude that it could have injuriously affected appellant's defense.

The motion for rehearing is overruled.

*Overruled.*